**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| v. : | Case Number: 25-MJ-207 |
| : | |
| **ANDREW JUAREZ,** : | |
| : | |
| : | |
| **Defendant.** : | |

## GOVERNMENT'S MEMORANDUM
## IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this Memorandum in support of its Motion for Pretrial Detention of Defendant Andrew Juarez under 18 U.S.C. § 3142(f)(1)(A). The defendant has been charged by Criminal Complaint in the United States District Court for the District of Columbia Travel with Intent to Engage in Illicit Sexual Conduct, in violation of 18 USC § 2423(b). This offense is a crime of violence involving a minor victim and, as a result, there is a presumption that weighs in favor of detention. Under the factors outlined in 18 U.S.C. § 3142(g), there is no condition or combination of conditions that will reasonably assure the safety of any person and the community if the defendant is released. As a result, detention is appropriate.

## BACKGROUND

On August 29, 2025, a Federal Bureau of Investigation Special Agent assigned to the Washington Field Office was acting in an online undercover (UC) capacity as part of the FBI Child Exploitation and Human Trafficking Task Force operating out of a satellite office in Manassas, Virginia.

In that capacity, the UC was monitoring the social media platform "Whisper Secrets," which is known to the UC as a place where people meet, discuss, and/or trade images, links or videos of underage children, and/or anonymously share sexual desires. "Whisper Secrets" is designed to be discreet and anonymous where users can post messages, known as "whispers," without revealing their identity.

On Friday, August 29, 2025, the UC responded to a whisper post by "Whisper Secrets" user "versuch" which read, "Anyone down to chat taboos or RP?[1] F preferred." "Whisper Secrets" user "versuch" was later identified as the defendant, Andrew Juarez. The UC replied, "Yessss what kind of taboos" to which the defendant said, "Any really what are some of your favorite ones." The UC replied, "Young and incest lol you" to which the defendant replied, "Same those are always fun."

The defendant stated that he was a 28-year-old male named "Drew" living in Maryland and asked the UC if she had any experience with taboo. The UC shared that she was sexually active with her daughter, and the defendant replied, "Awesome how old is she what have you done so far." The UC shared, "She's 9…Recently we've played with fingering, up to 2 fingers in her and now I think she's ready to try the real thingggg. Have you had young before?"

The defendant replied, "Awesome I'd be more than happy to supply it for her and you" and "Awesome sounds great I'd be more than happy to please you and her and yeah tho not recently." The UC then stated, "Ok gotta set it straight lol this isn't gonna be about hooking up with me lol I don't date men anymore. I just want to find this experience for her. I just wanna watch." The defendant responded, "Understandable That's perfectly fine with me how much can

---

[1] RP stands for "role play."

me and her do." The UC explained to the defendant that the only limit was anal and that she did not want the purported 9-year-old to be in pain, to which the defendant agreed.

The UC and the defendant then shared images of one another. The UC showed a partial image of her face and the defendant shared an image of his body from his beard to his feet standing in a bathroom with white and black tile and wearing gray underwear. He added the comment, "Here's a body pic let me know if you'd like to see what's beneath the boxers." After exchanging these images, the defendant asked the UC, "So when would you like to meet up?"

On Tuesday, September 2, 2025, the UC responded, providing her availability for the week. The UC stated that the purported 9-year-old had a half-day of school on Wednesday, September 3, 2025, and was free after 11 AM. The defendant stated that he was free on that day after he finished work and confirmed that he would be traveling from near Baltimore, Maryland.

On Tuesday, September 2, 2025, the UC asked the defendant "What are you most wanting to do with her? I wanna prep her for expectations. My only limit is anal." The defendant responded, "Eat her out and I feel if she rides it be better for since she can control how much and how fast she goes and you can also help her relax and stuff."

Later that day, the UC asked the defendant to exchange another picture before meeting. The UC then sent a partial face selfie holding up a sticky note which read, "Hi Drew! -Sami 😊."[2] The defendant then stated that he would also send a picture and asked the UC the name of her 9-year-old daughter. The UC responded with "Jessica but she likes to go by Jess 😊."

After the defendant confirmed the next day's meeting, the UC asked the defendant, "Are you SURE you're comfortable with this?" The defendant responded, "Yeah I'm sure are you and Jess comfortable too?" The UC replied, "Yes we are. Just wanna make sure you know this is my

---

[2] Sami is the name that the UC had provided the defendant earlier in their communications.

real 9 year old daughter this isn't fantasy!" The defendant responded with, "Yeah no I totally understand I'm down to do as much as you and her are comfortable with"

Shortly thereafter, the defendant sent a mirror selfie, showing a broad-shouldered male with a towel wrapped around his lower body. The subject's face was blacked out, but showed a large dark beard. The image also had a spot on what appeared to be his right bicep blacked out with marker, assumed to be a scar/mark/tattoo. The defendant then asked for an image of the UC's purported 9-year-old daughter. The UC responded with an image showing the girl laying on her stomach wearing a tank top and underpants watching TV.[3]

Later that day, the defendant sent an image which showed the bottom of his face to his mid-chest, wearing a gray t-shirt and holding up a note which read "Can't wait for our play date Sami and Jess." The defendant also stated, "I can't wait for Jess to ride it if she ends up being able to ride cream pie[4] her or not." The defendant explained that the UC's purported 9-year-old daughter would be his youngest yet, "unless another mom I was talking makes her mind up then it'll be 8." The defendant further explained, "Hey after have a great time tomorrow youll be able to convince more mom to make the fantasies into reality we could have our own club of moms and daughters that play together."

At this point in the conversation, the UC asked the defendant if he was comfortable communicating on any other platforms and provided the UC's Telegram username. The defendant stated that he would add the UC on Telegram and suggested that they do a video call while the UC "played" with her daughter.

---

[3] This image does not depict a real child.

[4] 'Creampie' is a sexual act in which a man ejaculates inside his partner's vagina or anus without the use of a condom, resulting in visible seeping or dripping of semen from the orifice.

Shortly thereafter, the UC received a Telegram message from Telegram display name "Go Ejj," and username "soupcanue," later confirmed to be the defendant, which read "Howdy Drew from WS."[5] After engaging in conversation, the defendant asked the UC "Oh yeah for sure now would lick her clean after cream pies or just let her get messier and messier?" The defendant asked the UC about exchanging further images, and said "how about vids tomorrow can we take some of course with all our faces covered" to which the UC shared one more image of her purported 9-year-old daughter[6] and agreed to taking images/videos during the next day's meeting.

In response to the photograph, the defendant told the UC "Awesome I cant wait I'm hoping I can fit all the way in just being still and up to half way when she starts to move." Moments later, the defendant asked the UC, "Ok will you like to see what she'll be riding or keep it a surprise for tomorrow?" He then sent the UC a photo of an erect penis. The defendant then suggested, "let's video her first time."

On September 3, 2025, the UC and the defendant continued to discuss meeting later that day. The defendant stated, "Awesome same here i can't wait either im counting the minutes till im off work."

At approximately 4:05pm, the defendant informed the UC that he had just gotten out of the shower and was about to leave to drive to D.C. He stated that he should arrive in D.C. around 5:40pm. At 5:06pm, at the defendant's request, the UC and the defendant engaged in a phone call via Telegram while the defendant was driving to the meeting location. During the phone call, the defendant confirmed that he was on his way to the meeting location. The defendant

---

[5] The remainder of the communications between the UC and the subject took place exclusively over Telegram.

[6] This image does not depict a real child.

confirmed that the plan was to meet at the bar with the UC and then go back to the UC's house where her purported 9-year-old daughter was.

At approximately 5:32 PM EDT, the defendant again called the UC's phone via the Telegram application. During this phone call, the defendant stated that he was close by and excited to meet. The defendant confirmed that he was communicating with other moms on social media and that if today's meet went well, he would like to start a club or group with other like-minded individuals. During this second phone call, the defendant also informed the UC that he brought several "masks" with him for him and the purported 9-year-old to wear for images/videos.

At approximately 5:45 PM EDT, the UC observed an individual matching the description from the photos wearing black pants, a gray shirt, black and white Adidas sneakers, and a black head covering, enter the building of 500 H. Street NW, Washington D.C., the agreed-upon meeting location. The individual went into the bathroom and texted the UC, "Yellow shirt black pants right?[7]"

Moments later, the individual approached the UC and greeted her by asking, "Sami?" and the UC responded, "Drew?" The individual then initiated a hug with the UC, which the UC reciprocated. The UC provided an arrest signal to law enforcement members who were conducting surveillance around the meet. The members then took the individual into custody, confirmed his identity as the defendant, and transported him to WFO for processing and an interview.

---

[7] This matches the description of the clothing worn by the UC.

The defendant was in possession of two cell phones, located in his pants pocket, at the time of his arrest.[8] Law enforcement also located two masks in his car, as well as a bottle of lubricant.

During the interview, the defendant acknowledged that he was the individual communicating with the UC and admitted having child sexual abuse material on his phone. He claimed that he planned to rescue the child and was going to alert law enforcement as soon as he confirmed the child was real.

## ARGUMENT

The Bail Reform Act permits a judicial officer to hold an individual without bond pending trial if the officer finds clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Pursuant to 18 U.S.C. § 3142(f)(1)(A), the judicial officer shall hold a hearing on the question of detention upon the motion of the government in a case that involves a crime of violence.

The crime of Travel with Intent to Engage in Illicit Sexual Activity, 18 U.S.C. § 2423(b), is a crime of violence involving a minor victim, which under 18 U.S.C. § 3142(e)(3)(E) creates a rebuttable presumption that the defendant constitutes a danger to the community, and that no pretrial release condition or combination of conditions may be imposed to assure the safety of any other person and the community. This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are

---

[8] These devices have not yet been reviewed.

rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released").

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the § 3142(g) factors. *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

## ANALYSIS

For the reasons that follow, the government submits that the defendant cannot rebut the presumption in favor of detention, and that there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community and that the defendant should therefore remain detained pending trial.

### A. The Nature and Circumstances of the Offense Charged

As noted above, the defendant has been charged with a crime of violence. Moreover, the defendant's conduct was extremely serious. The defendant traveled to D.C. to sexually abuse a 9-year-old girl. He repeatedly described the abuse that he intended to perpetrate and planned to film his exploitation of this child. He brought items with him to aid his intended abuse and would likely have succeeded, had he not been in fact communicating with an undercover law enforcement officer. Thus, the nature and circumstances of the offense weighs in favor of detention.

### B. The Weight of the Evidence Against the Defendant

The evidence against the defendant is strong. First, there is no question as to identity in this case: the defendant was arrested at the prearranged location and admitted to communicating with the UC. Second, the electronic communications clearly establish that the defendant's intent in traveling to D.C. was to sexually abuse the UC's purported 9-year-old daughter. His intent is further corroborated by the evidence found in his vehicle: lubricant and the two masks which he told the UC he brought to hide the identities of him and the child while filming the abuse. Thus, the strength of the evidence weighs heavily in favor of detention.

### C. The History and Characteristics of the Defendant

The defendant has no criminal history. However, this does not equate to a lack of prior criminal conduct. The defendant was active on a website where he stated that he was interested in "taboo." Moreover, he informed the UC that he was also communicating with at least one other mother and arranging to sexually abuse her eight-year-old daughter. He also admitted to law enforcement that he possessed child sexual abuse material on his phone. Thus, to the extent

the defendant's lack of criminal history weighs in his favor, it does not do so strongly, and certainly not enough to outweigh all the other factors.

### D. The Nature and Seriousness of the Danger to Any Person or the Community

Finally, the evidence here establishes that the defendant presents a danger to the community. Not only did the defendant travel to Washington, D.C. in order to sexually abuse a young child, but he claimed to be attempting to engage in similar conduct with another individual. Furthermore, he took steps to film the child's abuse. This conduct shows that not only does he have a sexual interest in children, but that his actions are not confined to the virtual world and pose an articulable danger to real children. Thus, this factor weighs heavily in favor of detention.

### CONCLUSION

For all of the reasons set forth above, and any other reasons set forth at any hearing on this issue, a consideration of the evidence in this case and the applicable statutory factors compels the conclusion that the defendant has not rebutted the statutory presumption in favor of detention, and should be detained pending trial.

WHEREFORE, the government respectfully requests that the Court grant its motion for detention of the defendant.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:  */s/ Caroline Burrell*
Caroline Burrell
CA Bar No. 283687
Assistant United States Attorney
United States Attorney's Office
601 D St., N.W.

Washington, DC 20530
Phone: (202) 815-8613

Case 1:25-mj-00207-GMH   Document 6   Filed 09/09/25   Page 11 of 11